# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| PUBLIC UTILITY DISTRICT NO. 2 OF PACIFIC COUNTY, a Washington municipal corporation, | DIVISION ONE |
| Respondent, | No. 77310-1-I |
| v. | PUBLISHED OPINION |
| COMCAST OF WASHINGTON IV, INC., a Washington corporation; CENTURYTEL OF WASHINGTON, INC., a Washington corporation; and FALCON COMMUNITY VENTURES I, L.P., a California limited partnership, d/b/a CHARTER COMMUNICATIONS, | |
| Appellants. | FILED: April 8, 2019 |

DWYER, J. — Pacific County Public Utility District No. 2 (District) permitted Comcast of Washington IV, Inc., CenturyTel of Washington, Inc., and Falcon Community Ventures I, L.P., d/b/a Charter Communications (collectively Companies) to attach their communications equipment to the District's utility poles pursuant to written agreements. In 2007, the District instituted significant increases to the rates it charged the Companies to attach their equipment to the utility poles. The Companies refused to pay the increased rates, and also refused to remove their equipment from the District's utility poles, leading the District to bring this lawsuit.

In 2008, our legislature amended the statute governing utility pole attachment rates, RCW 54.04.045, effective June 12, 2008. The amendment included a specific rate calculation formula, the result of which would yield a "just and reasonable" rate. RCW 54.04.045(3)(a)-(c). Whether the District's revised rates complied with the amended statute became the central dispute of the case.

This is the second time that this matter has come before us on appeal. See Pub. Util. Dist. No. 2 of Pacific County v. Comcast of Wash. IV, Inc., 184 Wn. App. 24, 336 P.3d 65 (2014) (hereinafter PUD I). In deciding the first appeal, we held that none of the parties correctly interpreted the statutory formula set forth by the amended statute because, instead of interpreting and applying the words of the statute, the parties attempted to shoehorn the statutory language into various preexisting formulas. We rejected this "closest to the pin" method of statutory interpretation, PUD I, 184 Wn. App. at 64, and remanded the matter for the parties to determine whether the District's rate was in compliance with the formula as it is set forth by the words of the statute.

In the trial court—and now on appeal—the District and the Companies derived different mathematical formulas from the words of the statute. Furthermore, the parties also dispute the validity of various data and inputs that the District utilized when calculating the maximum permissible rate allowed by the statute. We are presented with two principal issues: (1) whether the District abused its discretion when calculating the data and inputs it utilized to calculate the maximum permissible rate pursuant to RCW 54.04.045(3), and (2) whether the trial court erred by accepting the District's interpretation of the language set

2

forth in RCW 54.04.045(3)(a). We affirm the trial court with respect to the District's choice of data and inputs, but reverse the trial court's interpretation of the language set forth in RCW 54.04.045(3)(a). However, because the trial court's error in interpretation herein was harmless, we affirm the judgment.

I

The District is a consumer-owned utility organized as a municipal corporation pursuant to RCW 54.04.020. It provides electricity to customers in Pacific County. PUD I, 184 Wn. App. at 35. The District owns and maintains utility poles that it uses to provide its services, and to which it also permits third parties to attach communications equipment. PUD I, 184 Wn. App. at 35.

The Companies provide a variety of communication services to customers in Pacific County by attaching their communications equipment to the District's utility poles. PUD I, 184 Wn. App. at 35. The Companies initially attached their equipment to the District's utility poles pursuant to rental agreements assigned to them by previous communications providers in Pacific County. PUD I, 184 Wn. App. at 35. The assigned agreements date back to the 1970s and 1980s with respect to Comcast and Charter, and to the 1950s and 1960s with respect to CenturyTel. PUD I, 184 Wn. App. at 35.

Prior to 2007, the District's annual pole attachment rates had remained fixed for 20 years at $8.00 per pole for telephone companies and $5.75 per pole for cable companies. PUD I, 184 Wn. App. at 36. In February 2006, the District informed the Companies that it intended to terminate the agreements and provide the companies a new pole attachment agreement and new pole

3

attachment rates. PUD I, 184 Wn. App. at 36. The new rates would take effect on January 1, 2007. PUD I, 184 Wn. App. at 36.

To set its new rate, the District relied on a rate study, performed several years earlier, by EES Consulting, Inc. PUD I, 184 Wn. App. at 36. EES recommended that the District increase its rate to at least $20.65 per pole but preferably closer to $36.39 per pole. PUD I, 184 Wn. App. at 36. The study considered four different formulas for calculating the pole attachment rate: the United States Federal Communications Commission (FCC) Cable formula,[1] the FCC Telecom formula,[2] the American Public Power Association (APPA) formula,[3] and the Washington PUD Association formula.[4] PUD I, 184 Wn. App. at 36-37.

---

[1] The Cable formula states that:
a rate is just and reasonable if it assures a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way.
47 U.S.C. § 224(d)(1).

[2] The Telecom formula is as follows:
(2) A utility shall apportion the cost of providing space on a pole, duct, conduit, or right-of-way other than the usable space among entities so that such apportionment equals two-thirds of the costs of providing space other than the usable space that would be allocated to such entity under an equal apportionment of such costs among all attaching entities.
(3) A utility shall apportion the cost of providing usable space among all entities according to the percentage of usable space required for each entity.
47 U.S.C. § 224(e).

[3] The APPA formula can be presented algebraically as follows:
**Maximum Rate** = Assignable Space Factor + Common Space Factor
**Assignable Space Factor** = *Space Occupied by Attachment (Assignable Space)* x *Assignable Space (Pole Height)* x Average Cost (of Bare Pole) x Carrying Charge
**Common Space Factor** = *Common Space (Pole Height)* x *Average Cost of Bare Pole (Number of Attachers)* x Carrying Charge
PUD I, 184 Wn. App. at 36 n.6.

[4] The Washington PUD Association formula can be presented algebraically as follows:
Annual rental rate = Accumulated average Pole Value (PV) x Annual Cost Ratio (ACR) x Pole Use Ratio (PR)
PUD I, 184 Wn. App. at 37 n.7.

After considering and discussing the results of the study with the District's supervisors, the District's general manager recommended to the District's board of commissioners an annual rate of $19.70 per pole, to take effect at the start of 2008.[5] PUD I, 184 Wn. App. at 37.

The board of commissioners held public hearings on the proposed rate increases on December 5, 2006 and December 19, 2006. PUD I, 184 Wn. App. at 38. Even though the Companies knew about the public hearings, they did not send any representatives to attend, nor did they request the agenda or minutes from the hearings. PUD I, 184 Wn. App. at 38. On January 2, 2007, the board of commissioners adopted Resolution No. 1256, which accepted the proposed rates. PUD I, 184 Wn. App. at 38.

Subsequently, the District sent new agreements, incorporating the new rates, to the Companies and other then-current licensees for signature, explaining that all licensees must either sign the new agreement and pay at the new rate or remove their equipment from the District's utility poles. PUD I, 184 Wn. App. at 39. However, the Companies refused to sign the new agreement, declined to remove their equipment, and tendered payment only at the historical rates.[6] Although the existing agreements between the District and the Companies permitted the District to remove the Companies' equipment, the

---

[5] The general manager also recommended that for the year 2007 the District impose a transition rate of $13.25, thus allowing the steep rate increase to be phased in over a longer period. PUD I, 184 Wn. App. at 37.

[6] Two then-current licensees not involved in this action signed the new agreement and timely began paying at the revised rate. PUD I, 184 Wn. App. at 40. In contrast, at the time the parties filed their briefs in the current appeal, the Companies still had not signed the new agreements or tendered payment at the new rate, despite keeping their equipment attached to the District's poles.

District chose not to exercise this right. PUD I, 184 Wn. App. at 40. Instead, the District filed complaints against the Companies alleging claims of breach of contract, trespass, and unjust enrichment and seeking a declaratory judgment, injunctive relief, and damages. PUD I, 184 Wn. App. at 40. The Companies counterclaimed and sought to enjoin the District from imposing terms in violation of RCW 54.04.045. PUD I, 184 Wn. App. at 40. The lawsuits were consolidated by agreement.

Meanwhile, in March 2008, the legislature amended RCW 54.04.045, with an effective date of June 12, 2008. LAWS OF 2008, ch. 197, § 1. The prior version of the statute required only that pole attachment rates charged by Washington Public Utility Districts be "just, reasonable, nondiscriminatory and sufficient." Former RCW 54.04.045(2) (1996). This prior version did not provide any specific formula for calculating an appropriate rate. The amendment, however, instituted the following specific formula, the result of which would constitute a "just and reasonable rate." RCW 54.04.045(3).

> (3) A just and reasonable rate must be calculated as follows:
>
> (a) One component of the rate shall consist of the additional costs of procuring and maintaining pole attachments, but may not exceed the actual capital and operating expenses of the locally regulated utility attributable to that portion of the pole, duct, or conduit used for the pole attachment, including a share of the required support and clearance space, in proportion to the space used for the pole attachment, as compared to all other uses made of the subject facilities and uses that remain available to the owner or owners of the subject facilities;
>
> (b) The other component of the rate shall consist of the additional costs of procuring and maintaining pole attachments, but may not exceed the actual capital and operating expenses of the locally regulated utility attributable to the share, expressed in feet,

of the required support and clearance space, divided equally among the locally regulated utility and all attaching licensees, in addition to the space used for the pole attachment, which sum is divided by the height of the pole; and

(c) The just and reasonable rate shall be computed by adding one-half of the rate component resulting from (a) of this subsection to one-half of the rate component resulting from (b) of this subsection.

RCW 54.04.045.

The legislature also included the following provision relating to subsection (3)(a):

For the purpose of establishing a rate under subsection (3)(a) of this section, the locally regulated utility may establish a rate according to the calculation set forth in subsection (3)(a) of this section or it may establish a rate according to the cable formula set forth by the federal communications commission by rule as it existed on June 12, 2008, or such subsequent date as may be provided by the federal communications commission by rule, consistent with the purposes of this section.

RCW 54.04.045(4).

The legislature provided a statement of legislative intent with the amendment, which states:

It is the policy of the state to encourage the joint use of utility poles, to promote competition for the provision of telecommunications and information services, and to recognize the value of the infrastructure of locally regulated utilities. To achieve these objectives, the legislature intends to establish a consistent cost-based formula for calculating pole attachment rates, which will ensure greater predictability and consistency in pole attachment rates statewide, as well as ensure that locally regulated utility customers do not subsidize licensees. The legislature further intends to continue working through issues related to pole attachments with interested parties in an open and collaborative process in order to minimize the potential for disputes going forward.

LAWS OF 2008, ch. 197, § 1.

7

Whether the revised rate was in compliance with the amended statute became the central dispute in the case. Specifically, the parties disagreed about the proper interpretation of the space allocator component[7] of the statutory formulas in subsections (3)(a) and (3)(b).

Following a bench trial, the trial court issued a memorandum decision in which it ruled in favor of the District and against the Companies. PUD I, 184 Wn. App. at 42. The trial court ruled that the new pole attachment rates and the new agreement were valid and granted the District its requested relief. PUD I, 184 Wn. App. at 42-43. The Companies appealed.

II

On appeal from the first bench trial, the District and the Companies each asserted that the formula set forth in RCW 54.04.045(3) is actually just a combination of preexisting formulas.[8] PUD I, 184 Wn. App. at 58-59. In our decision rejecting their proposed formulations, we explained that neither attempted to apply the language of the statute as written. Instead, during the trial, the parties presented expert witness testimony that attempted to compare the language of the statute to preexisting formulas to show how the statutory

---

[7] The space allocator component is the component of the rate formula that determines what portion of the expenses for constructing and operating the pole will be charged to a licensee.

[8] The first appeal also resolved additional issues not pertinent to the current appeal. First, we upheld the District's new pole attachment agreement, holding that most of the non-rate terms were valid, and that all the invalid terms were severable. PUD I, 184 Wn. App. at 51. Next, we held that the new rate was in compliance with the former version of RCW 54.04.045, resolving the dispute as to the propriety of the rates changed during that time period. PUD I, 184 Wn. App. at 58. Next, we held that the District did not fail to mitigate its damages. PUD I, 184 Wn. App. at 77. Finally, we reversed part of the District's award of attorney fees, but this was primarily a result of our decision to reverse on the issue of the correct interpretation of RCW 54.04.045(3). Because there was not yet a clear prevailing party on the issue, the award of attorney fees regarding that issue was premature. PUD I, 184 Wn. App. at 82.

formula hewed more closely to their chosen formulas. PUD I, 184 Wn. App. at 58-59. These experts compared the statutory language to existing formulas, operating under the assumption that each subsection of the statute corresponded to a preexisting formula.[9] PUD I, 184 Wn. App. at 63-71.

## A

The District asserted that its expert's interpretation of subsection (3)(a) as the FCC Telecom formula was correct.[10] Additionally, the District asserted that its expert's interpretation was entitled to the deference courts show to agencies interpreting statutes that they are charged with administering. The District's primary support for its assertion that the formula was the FCC Telecom formula was that subsection (3)(a) could not be the FCC Cable formula. According to the District, the FCC Telecom formula and subsection (3)(a) both reference unusable

---

[9] Although the parties in the first appeal disputed the meaning of both subsections (3)(a) and (3)(b), we focus herein on the arguments they made regarding subsection (3)(a) because that is the subsection at issue in the current appeal. The parties do not dispute that the trial judge's interpretation of subsection (3)(b) during the remand trial was accurate, and the interpretation faithfully follows the language of the statute. Subsection (3)(b) states (space allocator language in bold):

> The other component of the rate shall consist of the additional costs of procuring and maintaining pole attachments, but may not exceed the actual capital and operating expenses of the locally regulated utility **attributable to the share, expressed in feet, of the required support and clearance space, divided equally among the locally regulated utility and all attaching licensees, in addition to the space used for the pole attachment, which sum is divided by the height of the pole.**

RCW 54.04.045(3)(b).

The trial judge and the parties agreed that this corresponds to the following space allocator formula:

$$\left( \frac{\left( \frac{Unusable\ space}{\#\ of\ attachers\ including\ the\ District} \right) + (space\ used\ by\ attachment)}{height\ of\ the\ pole} \right)$$

In the above formula, the support and clearance space, also known in the industry as unusable space, is apportioned equally between the District and all attachers, and such portion is added to the space used by the attachment. This sum is then divided by the height of the pole. This matches the language of subsection (3)(b).

[10] Br. of Resp't at 29, PUD I, No. 70625-0-I (Wash. Ct. App.), reprinted in 1 Briefs 184 Wn. App. (2014).

space,[11] but the FCC Cable formula does not.[12]

Additionally, the District averred that subsection (3)(a) could not be the FCC Cable formula because subsection (4) explicitly authorizes the use of an alternative between using subsection (3)(a) or the FCC Cable formula.[13] The District asserted that framing the choice between subsection (3)(a) and the FCC Cable formula as an alternative in the statute would be wholly nonsensical if subsection (3)(a) *was* the FCC Cable formula.[14]

In contrast, the Companies asserted that their expert's interpretation of subsection (3)(a) as the FCC Cable formula was correct.[15] Additionally, the Companies asserted that the District's interpretation was not entitled to any deference and that we should interpret the statute de novo.[16] The Companies presented three reasons why the space allocator formula in subsection (3)(a) is the FCC Cable formula and not the FCC Telecom formula. First, the Companies asserted that subsection (3)(a) and the FCC Cable formula provide for a space allocator that assigns costs in proportion to the space used for the pole attachment. Second, the Companies asserted that the FCC Telecom formula distributes two-thirds of the cost of unusable space on the pole based on the number of attaching entities. In contrast, according to the Companies, subsection (3)(a) and the FCC Cable formula do not assign costs based on the

---

[11] Although the parties dispute whether safety space should qualify as unusable space, they both agree that the support and clearance space referenced in subsection (3)(a) means unusable space.

[12] Br. of Resp't at 26, PUD I, No. 70625-0-I.

[13] Br. of Resp't at 27, PUD I, No. 70625-0-I.

[14] Br. of Resp't at 27, PUD I, No. 70625-0-I.

[15] Br. of Appellant Comcast at 20, PUD I, No. 70625-0-I (Wash. Ct. App.), *reprinted in* 1 Briefs 184 Wn. App. (2014).

[16] Br. of Appellant Comcast at 17-18, PUD I, No. 70625-0-I.

number of attaching entities and contain no reference to two-thirds of unusable space on the pole. As a result, the Companies reasoned, subsection (3)(a) cannot be the FCC Telecom formula and must be the FCC Cable formula.[17] Finally, the Companies asserted that subsection (3)(a) must be the FCC Cable rate because its language is virtually identical to the rate formula set forth in RCW 80.54.040, which has been interpreted by the Washington Utilities and Transportation Commission (WUTC) to be the FCC Cable formula.[18]

B

In our decision, we rejected the trial court's and the District's interpretation of the statutory formula set forth in subsection (3)(a). PUD I, 184 Wn. App. at 63-67. We held that the trial court erred by deferring to the testimony of the District's expert witness, and that by so deferring the trial court erred by failing to apply the language of the statute as written. PUD I, 184 Wn. App. at 62-67.

We first concluded that "no evidence was presented to the trial court that the PUD commission ever applied the unique formula in the amended statute to determine whether its revised rate was in compliance." PUD I, 184 Wn. App. at 62. Therefore, the trial court's decision to defer to the District's interpretation was not appropriately deferential to the District's board of commissioners but, rather, was inappropriately deferential to the District's expert witness. PUD I, 184 Wn. App. at 63. We further explained that even if the trial court had deferred to the District, rather than to an expert witness, such deference was inappropriate

---

[17] Br. of Appellant Comcast at 29-30, PUD I, No. 70625-0-I.
[18] Br. of Appellant Comcast at 30, PUD I, No. 70625-0-I.

11

herein because the District is not the only public utility implementing the statute. See PUD I, 184 Wn. App. at 60-61 ("With regard to the methodology set forth in subsections (3)(a), (b), and (c), that methodology must be applied. Uniformity could not be achieved if the courts deferred to 28 different PUD commission interpretations of the meaning of the words in a state statute.").

We next decided that the mistake of inappropriately deferring to the District's expert witness was compounded by the fact that the District's expert "evinced a disregard for the words of the statute as written by the legislature." PUD I, 184 Wn. App. at 63. The District's expert witness compared the language of the statute with the language of preexisting formulas and then applied those formulas rather than simply applying the language of the statute itself. PUD I, 184 Wn. App. at 63. We expressly rejected this "closest to the pin" method of statutory interpretation, PUD I, 184 Wn. App. at 64, explaining,

> Accepting that the legislature, in drafting the amendment, was unaware of these preexisting formulas—despite explicitly referencing one of them in RCW 54.04.045(4)—would require, on behalf of the trial court, a willing suspension of disbelief. Yet, by sanctioning [such an] approach, the trial court, in effect, ruled that while the legislature was aware of these various preexisting formulas, and although it intended to make subsections (3)(a) and (3)(b) reflect two of the established formulas, it instead wrote a unique formula with distinctive features.

PUD I, 184 Wn. App. at 63 (footnote omitted).

However, because the Companies' expert witness utilized the same "closest to the pin" approach to interpreting the statute, we did not rule that their

12

interpretation of the statutory language was correct.[19] PUD I, 184 Wn. App. at 63-64. Instead, we remanded the matter with instructions for the trial court to interpret the unique rate formula set forth by RCW 54.04.045(3) "based on the words of the statute and not based on opinions as to what formulas it appears to resemble." PUD I, 184 Wn. App. at 72.

C

Although we rejected the trial court's interpretation of RCW 54.04.045(3), we also concluded that "the formula is not designed to ensure mathematical certainty" and that "because the District enjoyed ample discretion prior to the 2008 amendment, the District retains considerable discretion in its rate calculation." PUD I, 184 Wn. App. at 72. We further explained that the lack of any specific instructions regarding a formula in the former version of RCW 54.04.045 required us to show deference to the District regarding the manner in which it calculated the pole attachment rate prior to the effective date of the 2008 amendment.[20] Critically, we also concluded that "the legislature's amendment of RCW 54.04.045 did not fully divest the District of the previously liberal discretion it enjoyed." PUD I, 184 Wn. App. at 72. We noted specifically that the District's discretion with regard to the data, assumptions, and other information it utilized to calculate the attachment rate "was not divested by the 2008 statutory

---

[19] Notably, we also declined to rule that subsection (3)(a) did not set forth a space allocator component similar to the FCC Cable formula.

[20] This was in keeping with our Supreme Court's decision in People's Org. for Wash. Energy Res. v. Utils. & Transp. Comm'n, 104 Wn.2d 798, 808, 823, 711 P.2d 319 (1985) (holding that the WUTC did not act arbitrarily or capriciously where rates to be set were required to be "'fair, reasonable, and sufficient'" (quoting State ex rel. Pub. Util. Dist. No. 1 of Okanogan County v. Dep't of Pub. Serv., 21 Wn.2d 201, 209, 150 P.2d 709 (1944))).

amendment." PUD I, 184 Wn. App. at 61. Therefore, we announced, courts must continue to defer to the discretion of public utility districts regarding the data, assumptions, and other information used to calculate the attachment rate, reviewing them only to determine if they were arbitrary and capricious. See PUD I, 184 Wn. App. at 61-62.

We emphasized that the District's exercise of discretion should be guided by the policies set forth by the legislature in the statement of intent accompanying the 2008 amendments to RCW 54.04.045. See PUD I, 184 Wn. App. at 73-74. To aid the trial court's review of the District's discretionary exercise of authority, we provided a nonexhaustive list of examples of certain aspects of the rate calculation over which the District retained discretion.

First, we declared that the District retained the discretion to decide whether to use gross expenses or net expenses when calculating the expenses attributable to attachers. PUD I, 184 Wn. App. at 73. This is so, we explained, because the language of the statute does not specifically define the term "expenses." PUD I, 184 Wn. App. at 73. Additionally, we concluded that the District's choice between the two should be guided by the statement of intent the legislature provided with the 2008 amendment to RCW 54.04.045. PUD I, 184 Wn. App. at 73. In particular, we directed that the choice must be made in accordance with the policies contained in the legislature's statement of intent "'to recognize the value of the infrastructure of locally regulated utilities'" and to

14

"'ensure that locally regulated utility customers do not subsidize licensees.'"[21] PUD I, 184 Wn. App. at 73 (quoting LAWS OF 2008, ch. 197, § 1).

Second, we expounded on the District's discretion to determine "whether to designate a portion of the pole as unusable 'safety space' and, if it does so, whether to require the Companies to bear a share of the cost associated with the unusable space." PUD I, 184 Wn. App. at 73. We concluded that the statute does not define that which constitutes unusable space, and that such definition is therefore left to the District's discretion. PUD I, 184 Wn. App. at 73-74. We specifically noted that "[i]nstituting a policy of not using the safety space is a prerogative of the District both as a rate maker and as a utility operator." PUD I, 184 Wn. App. at 74.

Third, and finally, we declared that the District retained the "discretion in the manner in which it calculates the number of licensees that attach per pole." PUD I, 184 Wn. App. at 74. We rejected the contrary assertion by the Companies that, as with the FCC formulas, which require rate makers to assume that there are three attachers per pole, the District was required to assume that there are three attachers per pole while calculating its rate pursuant to the formula in RCW 54.04.045. PUD I, 184 Wn. App. at 74. We concluded that the District's exercise of discretion in this regard "is in harmony with the legislature's stated intent that the amendment 'ensure that locally regulated utility customers

---

[21] This second policy goal originates from our state constitution. Local governments and municipal corporations are generally prohibited by our state constitution from freely giving any money, property, or credit to private individuals or businesses. CONST. art. VII, § 7.

do not subsidize licensees.'" PUD I, 184 Wn. App. at 74 (quoting LAWS OF 2008, ch. 97, § 1).

In sum, we provided the following direction to the trial court:

> On remand, the District must apply the statute as written to the relevant data, albeit subject to the discretion that was not withdrawn by the 2008 amendment. Only after receiving evidence and testimony based both on a proper application of the amended statute and on underlying data that, in the trial court's view, is worthy of being credited may the trial court determine whether the District's revised rates are, in addition to the other requirements imposed by RCW 54.04.045, "just and reasonable."

PUD I, 184 Wn. App. at 74-75.

### III

Following our ruling in PUD I, the matter was remanded to the trial court for a new trial on the issue of whether the District's new pole attachment rate was in compliance with the amended version of RCW 54.04.045(3). Unsurprisingly, the District and the Companies disputed the correct interpretation of RCW 54.04.045(3)(a) and whether the District had properly exercised its discretion when determining what data to rely on when calculating the maximum allowable pole attachment rate pursuant to subsection (3). Ultimately, the trial court ruled that the District had correctly interpreted subsection (3)(a) and did not abuse its discretion when determining what data to rely on when calculating the maximum allowable pole attachment rate.

At the remand trial, the District presented exhibits and testimony from the District's general manager regarding the District's process for determining whether its rate complied with RCW 54.04.045(3), as amended. The District's general manager testified that, after reviewing our decision in PUD I, he looked

through the amended version of RCW 54.04.045(3)(a) and attempted to convert the language of the statute to a numerical formula. Testifying specifically about his interpretation of the space allocator component of subsection (3)(a), the general manager explained that the space allocator component began with the language "attributable to that portion of the pole, duct, or conduit" and continued until the end of the paragraph. According to the general manager, this language corresponded to a two part mathematical formula in which the parts are added together.

For the first part, the general manager explained that he considered the language "that portion of the pole, duct, or conduit used for the pole attachment" to correspond to the following mathematical formula:

$$\frac{occupied\ space}{usable\ space}$$

For the second part, the general manager then considered the remaining language in subsection (3)(a), "including a share of the required support and clearance space, in proportion to the space used for the pole attachment, as compared to all other uses made of the subject facilities and uses that remain available to the owner or owners of the subject facilities," concluding that it corresponded to the following mathematical formula:

$$\left( \frac{\left( \frac{occupied\ space}{usable\ space} \right) \times (support\ and\ clearance\ space)}{height\ of\ the\ pole} \right)$$

Thus, added together, the District's proposed interpretation of the formulaic expression of the space allocator component of subsection (3)(a) is:

$$\left(\frac{occupied\ space}{usable\ space}\right) + \left(\frac{\left(\frac{occupied\ space}{usable\ space}\right)\ x\ (support\ and\ clearance\ space)}{height\ of\ the\ pole}\right)$$

The general manager further testified to the District's process for determining whether its new rate was in compliance with RCW 54.04.045. He explained how the District's board of commissioners reviewed and adopted his interpretation of subsection (3)(a) and selected the data to rely on while calculating the rate. The commissioners met multiple times to discuss the District's pole attachment rate subsequent to our decision in PUD I. During these meetings, the general manager presented his analysis of RCW 54.04.045(3) and an analysis of the effect on the maximum allowable rate caused by relying on different data inputs when calculating the rate, such as using either gross or net expenses.[22] The general manager made several recommendations to the commissioners regarding the data that should be used to calculate the rate, including a recommendation that the District be permitted to use gross expenses and to classify the safety space as support and clearance (and therefore

---

[22] The board of commissioners' resolution regarding the data used to calculate the pole attachment rate stated that

> among the data and inputs the District's General Manager considered in his review of the District's pole attachment rate, are, without limitation, those relating to: number of poles; data regarding transmission poles as well as distribution poles; average pole height; expected useful pole life; determination of costs using gross versus net numbers; average number of attachments per pole; usable pole space; support and clearance space; safety space as a component of support and clearance space; the share of the costs attachers on District poles should bear; carrying charge (e.g., various expenses and return on investment); and the General Manager has considered these types of inputs and data in light of the Legislature's statement of its intent in the 2008 amended statute recognizing the value of the District's infrastructure and ensuring that District utility customers do not subsidize attachers on District poles, pursuant to the Court of Appeals decision.

Plaintiff's Exhibit 1019, Resolution No. 1364, at 1-2.

unusable) space.

At the conclusion of its meeting on November 3, 2015, the commissioners adopted Resolution No. 1364, which accepted the general manager's interpretation of RCW 54.04.045(3), including subsection (3)(a), accepted the general manager's selection of data to input into the formulas set forth in RCW 54.04.045(3), and concluded that the District's pole attachment rate was below the maximum rate permitted by the statute.

At trial, the Companies disputed the District's evaluation of subsection (3)(a) and asserted that the District abused its discretion when determining the data it input into the formulas in subsections (3)(a) and (3)(b).[23] According to the Companies, the proper interpretation of all of the language of subsection (3)(a) is:

$$\left(\frac{occupied\ space}{height\ of\ the\ pole}\right) + \left(\frac{\left(\frac{occupied\ space}{usable\ space}\right)\ x\ (support\ and\ clearance\ space)}{height\ of\ the\ pole}\right)$$

The Companies further argued that this could be mathematically simplified to produce the following formula[24]:

$$\left(\frac{occupied\ space}{usable\ space}\right)$$

The Companies also claimed that the District included inappropriate charges in its rate calculation and misclassified the safety space as unusable

---

[23] The Companies did not dispute the District's interpretation of the formula set forth in subsection (3)(b).

[24] This formula is identical to the mathematical expression of the FCC Cable formula space allocator.

space. The Companies' preferred data and rate methodology resulted in a maximum permissible rate that was significantly lower than the District's.

The trial court ruled in favor of the District, accepting its interpretation of subsection (3)(a) and adopting its selection of expenses and other data inputs when calculating the pole attachment rate. Following its ruling, the trial court entered supplemental findings of fact and conclusions of law on remand, findings of fact and conclusions of law regarding plaintiff Pacific PUD's motion for supplemental award of attorneys' fees and litigation expenses based on remand trial, an order awarding attorneys' fees and litigation expenses based on remand trial, and an amended and restated judgment. The trial court awarded the District its requested damages, including prejudgment interest and attorney fees and costs.

The trial court rejected the Companies' interpretation of subsection (3)(a) because, in the judge's view, the Companies wanted the court "to find that (3)(a) is the same as the FCC Cable Formula based on their interpretation of the 'space factor' and their formula simplification which results in (3)(a) being the FCC Cable formula." The trial court reasoned that "[i]f the legislature had intended for (3)(a) to be the FCC Cable formula, the legislature would have no need to create a 'unique' formula. Therefore, an unstrained, plain reading of (3)(a) leads one to the logical conclusion that 3(a) is not, in its entirety, the FCC Cable formula."

The trial court also rejected the Companies' arguments that the District had abused its discretion while determining the data to be used when calculating the pole attachment rate formula. The trial court found that the testimony of the

20

Companies' expert witness alleging that inappropriate data and methods were utilized to calculate the pole attachment rate was unhelpful when determining whether the District abused its discretion because she had little to no experience with a public utility such as the District.[25]

The Companies appealed to Division Two, which transferred the matter to us for resolution.

IV

The Companies contend that the District abused its discretion when selecting the inputs and data used to calculate the pole attachment rate pursuant to RCW 54.04.045(3). Specifically, the Companies object to the District's classification of the "safety space"[26] on a utility pole as unusable space and to the District's inclusion of a return on equity, rate of return for depreciated debt expenses, taxes, and attorney fees as actual expenses. In response, the District contends that it has not abused its discretion by defining the safety space as unusable and by utilizing the aforementioned expenses to calculate its pole attachment rate. The District has the better argument.

---

[25] In its supplemental findings of fact and conclusions of law on remand, the court further explained that the Companies' expert witness had "virtually no experience with consumer-owned utilities," "no real-world knowledge of the District's operations, other than through review of some District documents," and that "[t]he only testimony Defendants' expert witness had ever given that relates to pole attachments is testimony filed in 2011 with the Public Service Commission of Utah." The trial court found that "[t]he testimony of Defendants' expert, based on private industry standards, provided little or no guidance as to how her testimony should relate to a public utility's discretionary authority." Additionally, the trial court found that "[w]hen Defendants' expert witness formed her conclusions, she had not reviewed updated District documents previously provided to Defendants' legal counsel by Plaintiff's counsel, because Defendants' counsel had not given those documents to her." Furthermore, instead of utilizing District-specific documentation when analyzing the District's rate calculations, the trial court found that "Defendants' expert witness used an FCC template for her work analyzing the District's rate calculations."

[26] The safety space comprises 40 inches of space on the pole between the communications attachments and the electrical attachments.

If a municipal utility's actions "come within the purpose and object of the enabling statute and no express limitations apply" then "the choice of means used in operating the utility [is left] to the discretion of municipal authorities." City of Tacoma v. Taxpayers of City of Tacoma, 108 Wn.2d 679, 695, 743 P.2d 793 (1987). Courts "limit judicial review of municipal utility choices to whether the particular contract or action was arbitrary or capricious, or unreasonable." City of Tacoma, 108 Wn.2d at 695 (citation omitted). This is an extremely deferential standard of review.

> "Arbitrary and capricious" refers to "willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action. Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous."

Lane v. Port of Seattle, 178 Wn. App. 110, 126, 316 P.3d 1070 (2013) (quoting Abbenhaus v. City of Yakima, 89 Wn.2d 855, 858-59, 576 P.2d 888 (1978)).

In PUD I, we concluded that, in regard to setting pole attachment rates, each public utility district "retains its preexisting discretion with regard to rate-setting *except* as that discretion is restricted by the amended [RCW 54.04.045]." PUD I, 184 Wn. App. at 60. Because the amended statute does not specifically define the data and expenses that the district must use to calculate an attachment rate, courts must defer to public utility districts when reviewing the compilation and calculation of the data and expenses they use to calculate their pole attachment rates. PUD I, 184 Wn. App. at 61-62, 72-74. However, a public utility district's exercise of discretion regarding the actual expenses used to calculate the pole attachment rate must be guided by the legislature's statement

22

of intent set forth in its 2008 amendment of RCW 54.04.045, including its instructions that the rate "'recognize the value of the infrastructure of locally regulated utilities'" and "'ensure that locally regulated utility customers do not subsidize licensees.'" PUD I, 184 Wn. App. at 73 (quoting LAWS OF 2008, ch. 197, § 1). So long as the District sets its rates by applying the formula set forth in RCW 54.04.045(3), the various inputs the District uses are reviewed only to determine whether the District acted arbitrarily and capriciously. See PUD I, 184 Wn. App. at 61-62.

## A

The Companies first contend that the District acted arbitrarily and capriciously when it classified the safety space on its utility poles as unusable space. This is so, they assert, because the District can and does place attachments in the safety space. In response, the District asserts that the record shows that it has a policy of avoiding placing attachments in the safety space and that occasional use of the safety space by the District does not make it arbitrary and capricious for the District to consider the safety space to be unusable space. The District has the better argument.

This issue was directly addressed in PUD I. Therein, we concluded that the District "retains discretion to determine whether to designate a portion of the pole as unusable 'safety space' and, if it does so, whether to require the Companies to bear a share of the cost associated with the unusable space." PUD I, 184 Wn. App. at 73. Our decision was clear that "the legislature did not define that which constitutes a proper share, and it did not define that which

23

constitutes unusable space," and that "the absence of further definition affords the District discretion to determine that which constitutes unusable space." PUD I, 184 Wn. App. at 73-74. "Instituting a policy of not using the safety space is a prerogative of the District both as a rate maker and as a utility operator." PUD I, 184 Wn. App. at 74.

Despite these clear directions from us, the Companies assert that the District's discretion regarding the classification of safety space is restrained by language in RCW 54.04.045(3)(a). Specifically, the Companies assert that the section that reads "including a share of the required support and clearance space, in proportion to the space used for the pole attachment, as compared to all other uses made of the subject facilities and uses that remain available to the owner or owners of the subject facilities" prohibits the District from classifying the safety space as unusable space. RCW 54.04.045(3)(a). This is so, they assert, because the safety space remains available for use by the District, the owner of the utility poles, for installation of streetlights and the District's fiber and that the District uses the space for those purposes.

The Companies' argument completely ignores our directive that the statute does not define that which constitutes unusable space and that such definition is left to the District's discretion. The Companies' statutory argument fails because, as the District has defined unusable space, something we decided in PUD I that the District has the discretion to do, the safety space is unusable. If, as here, there is some support in the record for the District's classification, it is not "willful and unreasoning action, taken without regard to or consideration of

24

the facts and circumstances surrounding the action." Abbenhaus, 89 Wn.2d at 858. Herein, the District's classification is supported by the record, which shows that the District has established a policy of not using the safety space and taken steps to comply with that policy. The implementation of such a policy is "a prerogative of the District."[27] PUD I, 184 Wn. App. at 74. The District did not abuse its discretion by classifying the safety space as unusable.

B

The Companies next assert that the District abused its discretion by including numerous expenses in its calculation of the pole attachment rate and that these inclusions resulted in an arbitrary and capricious over-allocation of costs to the Companies. Specifically, the Companies object to the inclusion of a return on equity, rate of return on debt expenses, taxes, and attorney fees as actual expenses.[28] In response, the District asserts that it has the discretion to include all of these expenses because they are actual expenses of the District and are within the bounds of the District's discretion to determine the expenses it

---

[27] The Companies' rather churlish protestations that they should not be required to pay for the safety space, created to protect the safety of their own workers, see PUD I, 184 Wn. App. at 73 n.39, because of the District's staff's failure to always comply with the District's policy not to use the safety space, would be better directed toward the District's board of commissioners in their supervisory role over the District's management.

[28] The Companies also object to the District's allocation of indirect costs. However, the Companies offer no argument grounded in Washington law to support their contention that the District has misallocated indirect costs. Instead, the Companies simply argue that the allocation of indirect costs must be arbitrary and capricious because the indirect cost allocation is not proportional to the allocation of capital costs and direct costs among the District's different operations. We disregard this argument because the Companies' position is unsupported by any legal authority or any citation to the record indicating that the District utilized inaccurate numbers. The Companies also claim that the trial court erred by finding that the Companies conceded that the District utilized the correct number of attachers per pole when calculating the rate. However, the record clearly shows that the Companies withdrew their position on this issue during the remand trial.

includes when calculating the pole attachment rate. Again, the District has the better argument.

The Companies first aver that the District is precluded from including a return on equity as an actual expense chargeable to the Companies.[29] This is so, they assert, because RCW 54.04.045 does not explicitly permit the District to include just compensation as a component of its pole attachment rate.[30] However, the legislature's stated intent in passing the 2008 amendments to RCW 54.04.045 was to "recognize the value of the infrastructure of locally regulated utilities" and to "ensure that locally regulated utility customers do not subsidize licensees." LAWS OF 2008, ch. 197, § 1. The District's customers are functionally equivalent to investors because they fund the construction and maintenance of the District's utility poles, and it respects their investment in the system to charge

---

[29] The Companies also assert that the District's financial records did not include the necessary information for the District to calculate a return on equity component of the pole attachment rate. This assertion is rebutted by the record. The District's general manager testified as to how the District calculated the rate based on its financial records, specifically by relying on its records of retained earnings as set forth in the District's balance sheet. This balance sheet was included as a part of aggregate figures in the District's annual report to the state auditor. The trial court obviously credited this testimony when it ruled in the District's favor on this issue.

[30] The Companies also contend that the inclusion of a return on equity as a component of the pole attachment rate violates RCW 54.16.330(4). This argument fails for three reasons. First, the statute addresses the District's ability to set rates for the sale of its telecommunications services, not pole attachment rates. Second, the Companies' referenced subsection only prohibits the District from giving itself a discount when it uses its own telecommunications services, it does not address the rates the District can charge other entities for other services. RCW 54.16.330(4) ("A public utility district may not charge *its* nontelecommunications operations rates that are preferential or discriminatory compared to those it charges entities purchasing wholesale telecommunications services." (emphasis added)). Third, even if RCW 54.16.330(4) did apply to the setting of pole attachment rates, RCW 54.16.330(2) defines discriminatory rates as "when a public utility district offering rates, terms, and conditions to an entity for wholesale telecommunications services does not offer substantially similar rates, terms, and conditions to all other entities seeking substantially similar services." Because the Companies seek a different service than the District's wholesale telecommunications customers, namely to attach equipment to utility poles rather than purchasing broadband, the District need not charge a similar rate.

26

a return on equity to third party pole attachers that make use of the publicly financed utility poles for their private gain.[31]

Furthermore, the Companies admit in their briefing that the FCC Cable formula incorporates a return on equity. It can hardly be argued that the legislature sought to prohibit the District from obtaining a return on equity in RCW 54.04.045(3) when, in RCW 54.04.045(4), it explicitly authorizes the District to make use of the FCC Cable formula, which includes such a return on equity. We therefore conclude that the District did not abuse its discretion by incorporating a return on equity in its pole attachment rate.

The Companies next aver that the District inappropriately included a rate of return component for the District's depreciated debt expenses in its pole attachment rate calculations. Citing to no authority, the Companies rely solely on the testimony of their expert witness—testimony which was explicitly rejected by the trial court—to assert that the District can charge a rate of return only for its undepreciated assets. As admitted by the Companies' expert witness, this is essentially an objection to the District's use of gross figures instead of net figures when calculating the rate of return on debt expenses.[32] However, because the credibility of witnesses is best determined by the trier of fact, In re Disciplinary

---

[31] This also addresses the Companies' assertion that the District, as a nonprofit entity, has no reason to obtain a return on equity. As the District notes in its briefing, any return on equity received by the District can be reinvested into maintenance of the District's utility poles. This further helps to protect the investment in the system made by the District's customers.

[32] The Companies' expert claimed that "the rate of return is only applicable on unrecovered investment." She further explained that the "rate of return is the payment for the fact that someone has expended money ahead of time and you are now paying back that principal over time." The basic idea is that the Companies should not be required to pay a rate of return based on the initial amount invested, the gross costs, because the District has recovered some of its investment through the use of those poles, thus reducing its net costs.

Proceeding Against Kuvara, 97 Wn.2d 743, 747, 649 P.2d 834 (1982), and the trier of fact herein chose not to credit this testimony, we have no basis to rely on the testimony of the Companies' expert witness in resolving this claim of error.

Furthermore, even if we did consider the argument raised by the Companies' expert witness, the District's decision to incorporate a rate of return element on depreciated debt expenses simply does not constitute arbitrary and capricious action.[33] As we previously stated in PUD I, the use of gross or net figures is left to the District's discretion. 184 Wn. App. at 73. That discretion is guided by the legislature's intent that the pole attachment rate "'recognize the value of the infrastructure of locally regulated utilities'" and to "'ensure that locally regulated utility customers do not subsidize licensees.'" PUD I, 184 Wn. App. at 73 (quoting LAWS OF 2008, ch. 197, § 1). The District concluded that the use of gross costs, in this case charging a rate of return on debt expenses for all assets instead of just undepreciated ones, resulting in a higher rate of return, is best in keeping with these goals.[34] The District's choice herein to charge a rate of return for all assets regardless of depreciation does not run afoul of the legislature's

---

[33] As with many of the Companies' arguments regarding inputs, their complaint about the District's accounting choices would more appropriately be directed toward the District's board of commissioners. The arbitrary and capricious standard of judicial review is not a catch all standard intended to allow courts to interfere with agency decision-making in order to forestall any and all mistakes or perceived errors in judgment made by public officials. Rather, it permits courts to intervene to stop only "willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action." Abbenhaus, 89 Wn.2d at 858. For other discretionary actions that do not constitute arbitrary and capricious conduct, the remedy for those disapproving of choices made is at the ballot box.

[34] The District additionally contends that the fact that it pays no federal income tax also justifies the higher rate of return on debt. This is irrelevant. Whether the District receives a tax benefit for depreciation is not at issue. However, how much the District, and thus the District's customers, should be compensated for having made the costly initial investment into the District's utility pole system, is guided by the legislature's stated intent in RCW 54.04.045. The legislature wished to recognize the value of the infrastructure, and charging a rate of return on all assets, depreciated or not, recognizes that value.

stated intent. Thus, even were we to accept the Companies' expert witness's testimony, we would decline to conclude that such a decision by the elected commissioners constituted arbitrary and capricious action.

The Companies next aver that the District improperly included taxes on its electrical operations as an expense component of its pole attachment rate. This is so, the Companies assert, because the taxes on the District's electrical business are not attributable to third party telecommunications pole attachers. In response, the District asserts that the tax expense is a component of the District's utility pole system, and that because the Companies would have nowhere to attach their equipment without the District's utility pole system, they should be required to pay a share of the taxes. The District's position is consistent with our decision in PUD I that not every expense of operating the utility poles has to benefit attachers in order to warrant the attachers sharing in the expense. 184 Wn. App. at 72 n.38 (concluding that a deduction in the rate for the "cross arms" space on a pole is not required by statute even though the cross arms do not benefit attachers). We conclude that the District's inclusion of taxes as an expense chargeable to attachers in the pole attachment rate is in keeping with the legislature's stated intent to value the District's infrastructure and that the District's inclusion of tax expenses as a component of the pole attachment rate was not arbitrary and capricious.

Finally, the Companies contend that the District improperly included attorney fees as an expense component of its pole attachment rate. Specifically, the Companies assert that the District may not include litigation expenses in the

29

rate because the District has been granted a partial award of attorney fees in court, and thus the recovered fees are no longer an actual expense.

The Companies' contention here is essentially a claim that they should receive an offset in the rate because they will have already made payment for some of the District's litigation expenses. Such a claim of entitlement to an offset constitutes an avoidance, and is therefore an affirmative defense. See CR 8(c); Locke v. City of Seattle, 133 Wn. App. 696, 713, 137 P.3d 52 (2006) (holding that jury instructions placing the burden of proof for establishing the amount of an offset on the defendant City of Seattle were proper because an offset is "in the nature of an avoidance"), aff'd, 162 Wn.2d 474, 172 P.3d 705 (2007). In such circumstances, "[t]he burden of proof is . . . placed upon the party asserting the avoidance or affirmative defense." Locke, 133 Wn. App. at 713 (citing Gleason v. Metro. Mortg. Co., 15 Wn. App. 481, 551 P.2d 147 (1976); Tacoma Commercial Bank v. Elmore, 18 Wn. App. 775, 573 P.2d 798 (1977); 3A LEWIS H. ORLAND & KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE CR 8, at 138 (4th ed. 1992)).

The Companies do not assert that they have actually paid any of the District's litigation expenses to date, nor do they offer anything in support of their contention other than vague assertions that the District is double counting. Nowhere in the record did the Companies prove that they have actually paid any of the District's litigation expenses. Nowhere in the record did the Companies establish a percentage of the rate sought to be charged to them as corresponding to payments that they have already made. Nowhere in the record

did they establish what amount of the District's litigation expenses that they may be ordered to pay would impact in any quantified way the lawfulness of the rate sought to be charged to them. In this way, they have failed to meet their burden of proof to establish that they are entitled to an offset.

Litigation expenses are an actual expense of the District in its effort to conduct its utility pole operations. Including them as an expense in the pole attachment rate was not an abuse of discretion.

V

The Companies' primary assertion on appeal is that the trial court erred by accepting the District's interpretation of RCW 54.04.045(3)(a). Specifically, the Companies object to the District's interpretation of the space allocator component of the formula set forth therein. The Companies aver that the District's interpretation improperly applies the language of the statute by interpreting the words "the pole" to mean "usable space on the pole" without justification. In response, the District avers that the Companies' proposed alternative, which interprets the words "the pole" to mean "the height of the entire pole," disregards our previous directive that RCW 54.04.045 sets forth a unique formula that does not match any preexisting formulas. This is so, the District asserts, because the Companies' proposed alternative interpretation is mathematically functionally equivalent to the FCC Cable formula.

A trial court's interpretation of a statute is subject to de novo review. Landmark Dev., Inc. v. City of Roy, 138 Wn.2d 561, 569, 980 P.2d 1234 (1999). Courts must interpret a statute to effectuate the legislature's intent. Bostain v.

31

Food Express, Inc., 159 Wn.2d 700, 708, 153 P.3d 846 (2007). Where the meaning of the words of a statute are plain and not ambiguous, "we give effect to that plain meaning as the expression of the legislature's intent." Bostain, 159 Wn.2d at 708. "Plain meaning is determined from the ordinary meaning of the language used in the context of the entire statute in which the particular provision is found, related statutory provisions, and the statutory scheme as a whole." Bostain, 159 Wn.2d at 708. If a statute's language is subject to more than one reasonable interpretation, then we look to other indicia of legislative intent. Bostain, 159 Wn.2d at 708. A "clear and explicit statement of intent should guide analysis of the statute as a whole." In re Custody of M.W., 185 Wn.2d 803, 814, 374 P.3d 1169 (2016).

A

The District contends that the space allocator formula set forth in RCW 54.04.045(3)(a) can be mathematically depicted as:

$$\left( \frac{occupied\ space}{usable\ space} \right) + \left( \frac{\left( \frac{occupied\ space}{usable\ space} \right) \times (support\ and\ clearance\ space)}{height\ of\ the\ pole} \right)$$

According to the District, this formula converts the language of subsection (3)(a) to a mathematical formula that the District can apply as the space allocator component of its calculation of the maximum permissible pole attachment rate pursuant to that subsection. In response, the Companies assert that the first component of the District's formula incorrectly divides the occupied space by the usable space on the pole when the statutory language requires division by the total height of the pole.

The Companies assert that the space allocator formula set forth in RCW 54.04.045(3)(a) is correctly mathematically depicted as:

$$\left(\frac{occupied\ space}{height\ of\ the\ pole}\right) + \left(\frac{\left(\frac{occupied\ space}{usable\ space}\right)\ x\ (support\ and\ clearance\ space)}{height\ of\ the\ pole}\right)$$

Furthermore, the Companies assert that this formula can be simplified to the following equation:

$$\left(\frac{occupied\ space}{usable\ space}\right)$$

As a result, the Companies contend that subsection (3)(a) is the FCC Cable formula.

In response, the District avers that the Companies' simplified formula cannot be correct because it does not reflect the words set forth in subsection (3)(a). The District further contends that even the nonsimplified version must be an inaccurate interpretation because it is the mathematical equivalent of the FCC Cable formula, which, according to the District, would contradict our holding in PUD I that RCW 54.04.045(3) sets forth a unique formula.[35] We conclude that the Companies' nonsimplified formula accurately interprets the statutory language set forth in RCW 54.04.045(3)(a).

---

[35] Contrary to the District's assertion, we never held that the space allocator component of the portion of the formula set forth in RCW 54.04.045(3)(a) could not be mathematically equivalent to the space allocator component of the FCC Cable formula. While PUD I directed the trial court on remand to apply the "unique rate formula based on the words of the statute," 184 Wn. App. at 72, it said nothing to the effect that subsection (3)(a) cannot produce a space allocator component that is mathematically equivalent to the FCC Cable formula's space allocator. By focusing on the mathematics, rather than on the words of the statute, the trial court erroneously concluded that subsection (3)(a) must set forth a space allocator component that is mathematically distinct from the FCC Cable formula's space allocator.

The District failed to provide any analysis of the disputed statutory language that supports the first component of its interpretation of the space allocator formula set forth in subsection (3)(a).[36] The closest the District comes to making any sort of argument that supports its interpretation is when it asserts that the divisor of the first part of its formula must be the usable space because it is "the only space on the pole that third-party attachers are authorized by National Electrical Safety Code (NESC) Rules to use." However, such an argument fails to overcome the plain language of subsection (3)(a), which states that the District must calculate costs that are "attributable to that portion **of the pole** . . . used for the pole attachment" instead of attributable to that portion of the usable space on the pole used for the pole attachment. RCW 54.04.045(3)(a) (emphasis added).

The Companies point out precisely the aforementioned problem with the District's interpretation,[37] asserting that the first component of the space allocator

---

[36] Rather than offer support for its position in the statutory text, the District merely restates, with conclusory language, that the general manager interpreted the statutory language and that the trial court accepted this interpretation. However, the record reveals that when questioned regarding his interpretation, the District manager was unable to articulate any reason derived from the language of the statute for his interpretation of the words "of the pole" to mean of the usable space on the pole. Furthermore, as we previously discussed herein, our review of the trial court's interpretation of the statute is de novo and we owe no deference to the District's, nor the District's general manager's, interpretation.

[37] The Companies assert two additional reasons for rejecting the District's interpretation. First, they assert that the District's interpretation is "mathematically impossible" because it double allocates a portion of the costs of the unusable space on the pole to the Companies. How this makes the formula mathematically impossible, as opposed to simply a formula which allocates a greater percentage of the costs of the pole to the Companies than they desire, is never explained. Second, the Companies assert that we should give great weight to the WUTC's interpretation of RCW 80.54.040, which the Companies assert has nearly identical language to RCW 54.04.045. The Companies contend that because the WUTC has interpreted the pertinent language in RCW 80.54.040 to be the FCC Cable rate, we should construe RCW 54.04.045(3)(a) in the same manner. This argument contrasts sharply with the Companies' position in PUD I, wherein they correctly asserted that we should construe the language of the statute de novo without deferring to an implementing agency's interpretation. If it is correct, and indeed it is, that we should not defer to an agency responsible for implementing RCW 54.04.045, it is undoubtedly correct that

34

formula set forth in subsection (3)(a) must divide the occupied space by the total height of the pole. Such an interpretation matches the directive set forth in the statute that the pole attachment rate charge attachers for costs "attributable to that portion **of the pole** . . . used for the pole attachment." RCW 54.04.045(3)(a) (emphasis added). We therefore conclude that the Companies' nonsimplified formula, as set forth herein, correctly interprets the space allocator component of subsection (3)(a):

$$\left(\frac{occupied\ space}{height\ of\ the\ pole}\right) + \left(\frac{\left(\frac{occupied\ space}{usable\ space}\right) \times (support\ and\ clearance\ space)}{height\ of\ the\ pole}\right)$$

B

Had they stopped with their nonsimplified formula, the Companies would have correctly interpreted the space allocator component of the formula set forth in RCW 54.04.045(3)(a). However, the Companies, not satisfied with our ruling in the first appeal, seek once again to have subsection (3)(a) declared to be the FCC Cable formula. At trial, the Companies' expert witness testified that the expanded space allocator formula that the Companies assert is set forth in RCW 54.04.045(3)(a) can be mathematically simplified to be the mathematical representation of the space allocator component set forth by the FCC Cable formula. Therefore, they assert, subsection (3)(a) is the FCC Cable formula. We do not agree.

we decline to defer to a different agency's interpretation of a different statute when that agency is not even charged with the implementation of RCW 54.04.045. We therefore reject these arguments.

35

In PUD I, we noted that RCW 54.04.045(3) sets forth a unique formula and, thus, despite some similarities to previously existing formulas, does not simply adopt one or more previously existing formulas. See 184 Wn. App. at 70-71. A product of intense legislative negotiation, RCW 54.04.045(3) sets forth a two part formula that combines half of the rate calculated by applying the words of the statutory formula set forth in subsection (3)(a)[38] with half of the rate calculated by applying the words of the statutory formula set forth in subsection (3)(b). Although there are similarities to other formulas, the language used in these subsections is not the same as that set forth by any of the preexisting formulas that the Companies and the District compared the statute to in PUD I, including the FCC Cable formula.[39] See 184 Wn. App. at 70-71.

Furthermore, if the legislature had intended for subsection (3)(a) to be the FCC Cable formula, as opposed to merely producing a mathematically equivalent formula, it could have simply stated that the District should apply the FCC Cable formula.[40] See PUD I, 184 Wn. App. at 63. However, by refusing to do so, the legislature ensured that public utility districts utilized a mathematically equivalent rate to the FCC Cable formula, without becoming bound to follow any federal interpretations or rules relating to the FCC Cable formula. The legislative process can be a delicate balancing act between competing interests, and we

---

[38] Or, as subsection (4) states, the District may use half of the rate calculated using the current FCC Cable formula instead of using the formula set forth by subsection (3)(a).

[39] The Companies assert that it is the mathematical equivalency to the FCC Cable formula that makes subsection (3)(a) the FCC Cable formula. This is directly contrary to our directive in PUD I to apply the words of the statute. Whether the space allocator formula produced by the language of subsection (3)(a) is mathematically equivalent to any preexisting space allocator formulas is irrelevant, as it is the words of the statute that are significant. See PUD I, 184 Wn. App. at 72.

[40] As it did in subsection (4).

can easily envision the legislature actively avoiding shortcut references in the language of the 2008 amendment to RCW 54.04.045 in order to avoid the prospect of foreign judicial opinions or agency interpretations interfering with the balance struck between public utility districts and those entities, such as the Companies, who were involved in the 2008 bill's development and implementation. Indeed, we noted a specific example of the results of such an approach in PUD I when we explained that, while the FCC Cable formula requires certain assumptions to be made regarding the inputs used when calculating the pole attachment rate, no assumptions regarding inputs are required by the formula set forth in RCW 54.04.045(3)(a)-(b). See 184 Wn. App. at 74 ("[P]ursuant to the federal formulas, the number of attachers must be assumed to be three. However, because the formula created by the legislature is unique, it was not incumbent on the District to assume that there were three attachers per pole.").

The formula set forth in subsection (3)(a) is both mathematically equivalent to the FCC Cable formula and distinct from the FCC Cable formula. The legislature's decision to choose its own words to establish a rate formula (and thereby foreclose foreign authorities from in any way acting in a manner that would alter the balance struck by the legislature) protects public utility districts from any limitations to their discretion not specifically enumerated in the 2008 amendment. Similarly, it protects attachers from any rate changes not authorized by the legislature. Thus, we reject the Companies' assertion that RCW 54.04.045(3)(a) is the FCC Cable formula. Instead, it is what it is.

C

Although the District and the trial court erred in interpreting the language of RCW 54.04.045(3)(a), that does not establish that the Companies should prevail. Because the District's and the trial court's only error was in its interpretation of the space allocator component of the formula set forth in RCW 54.04.045(3)(a), and because we affirm the trial court's decision to credit the District's selection of data and inputs to calculate the maximum permissible rate pursuant to the statute, we may determine if the trial court's error herein was harmless.[41] We conclude that it was.

"Error without prejudice is not grounds for reversal, and error is not prejudicial unless it affects the case outcome." Qwest Corp. v. Wash. Utils. & Transp. Comm'n, 140 Wn. App. 255, 260, 166 P.3d 732 (2007) (citing Brown v. Spokane County Fire Prot. Dist. No. 1, 100 Wn.2d 188, 196, 668 P.2d 571 (1983)). Where the trial court incorrectly interprets a statute, but such misinterpretation has no effect on the outcome of the case, the error is harmless. See Qwest, 140 Wn. App. at 259-60 (holding that trial court's failure to apply the correct standard of review required by statute was harmless error).

Herein, because we conclude that the District's selection of data and inputs, credited by the trial court,[42] was within the bounds of the District's

_____

[41] Remarkably, the District declined to address this possibility in its briefing or when specifically asked about it during oral argument. However, we "may affirm the trial court's ultimate decision on any grounds established by the pleadings and supported by the record." Verbeek Props., LLC v. GreenCo Envtl., Inc., 159 Wn. App. 82, 90, 246 P.3d 205 (2010).

[42] Our calculation of the maximum permissible rate pursuant to the statute is possible because we are affirming the trial court's decision to credit the District's selection of data and inputs. If the trial court had not credited these data and inputs, or if we concluded that resort to any of them constituted an abuse of the District's discretion, we would not be able to calculate the maximum permissible rate without inappropriately placing ourselves in the role of fact finder.

discretion, we can apply those data and inputs to the formula set forth in RCW 54.04.045(3).[43] Our calculations regarding the maximum permissible rate for the years 2008 through 2015 are set forth in the following table:[44]

| | | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|
| 1. | Avg Cost of Bare Pole ($) | 678.54 | 690.16 | 717.11 | 726.88 | 736.42 | 746.26 | 764.79 | 795.63 |
| 2. | Carrying Charge (%) | 17.41 | 17.79 | 18.65 | 16.79 | 17.24 | 17.76 | 18.08 | 17.53 |
| 3. | Avg pole height (ft.) | 41.8 | 41.8 | 42.0 | 42.0 | 42.0 | 42.1 | 42.1 | 42.2 |
| 4. | Total support and clearance space (ft.) | 27.5 | 27.5 | 27.5 | 27.5 | 27.5 | 27.5 | 27.5 | 27.5 |
| 5. | Total usable space (ft.) | 14.3 | 14.3 | 14.5 | 14.5 | 14.5 | 14.6 | 14.6 | 14.7 |
| 6. | Space Occupied (ft.) | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 7. | RCW 54.04.045(3)(a) space allocator component | 0.07 | 0.07 | 0.07 | 0.07 | 0.07 | 0.07 | 0.07 | 0.07 |
| 8. | Maximum permissible rate per subsection (3)(a) ($) | 8.27 | 8.59 | 9.36 | 8.54 | 8.89 | 9.28 | 9.68 | 9.76 |
| 9. | Maximum permissible rate per subsection (3)(b) ($) | 33.08 | 34.38 | 36.11 | 32.95 | 34.28 | 35.78 | 37.33 | 37.66 |
| 10. | Maximum permissible rate per RCW 54.04.045(3) ($) | 20.68 | 21.49 | 22.74 | 20.75 | 21.59 | 22.53 | 23.51 | 23.71 |

---

[43] The data and inputs we rely on herein are drawn from Plaintiff's Exhibit 1033, which is attached to this opinion as Appendix A.

[44] The following details provide an explanation of the data contained in the table. First, the data in rows 1 through 6 and row 9 are copied verbatim from Plaintiff's Exhibit 1033. Rows 1 and 2 set forth the amount of the average cost of a bare pole and the carrying charge. These inputs reflect the capital and operating expenses of the District regarding their utility poles. Rows 3 through 6 provide the data utilized by the District regarding the height of their utility poles and the classification of space on the pole. Row 9 sets forth the District's calculation of the maximum permissible pole attachment rate pursuant to RCW 54.04.045(3)(b). Because the District correctly interpreted subsection (3)(b) and utilized appropriate data and inputs we do not need to recalculate the maximum permissible rate pursuant to subsection (3)(b). Row 7 contains the space allocator component obtained as a result of applying the District's data to the formula set forth by RCW 54.04.045(3)(a) as discussed above, rounded to the nearest one hundredth (the

In each year, the maximum permissible rate (row 10) is higher than the District's rate of $19.70. Therefore, the trial court's failure to properly apply the space allocator component of the formula set forth by RCW 54.04.045(3)(a) did not materially affect the outcome of the trial. The trial court's error was harmless because the District's rate is in compliance with the statute as properly applied.

VI

The District also seeks affirmance of its award of attorney fees from the first trial in addition to subsequent awards granted by the trial court and an award of its fees and costs incurred in this appeal. Because the District's contracts with the Companies provide for an award of attorney fees when the District is the prevailing party, and because the District is the prevailing party, the District is entitled to an award of fees.

Whether there is a legal basis for awarding attorney fees is reviewed de novo, but a discretionary decision to award fees and expenses, and the reasonableness of such an award, is reviewed for an abuse of discretion. Gander v. Yeager, 167 Wn. App. 638, 647, 282 P.3d 1100 (2012).

"Washington follows the American rule 'that attorney fees are not recoverable by the prevailing party as costs of litigation unless the recovery of such fees is permitted by contract, statute, or some recognized ground in equity.'" Panorama Vill. Condo. Owners Ass'n Bd. of Dirs. v. Allstate Ins. Co., 144 Wn.2d 130, 143, 26 P.3d 910 (2001) (quoting McGreevy v. Or. Mut. Ins. Co.,

---

same rounding as performed by the District in Plaintiff's Exhibit 1033). Row 8 sets forth the maximum permissible rate pursuant to RCW 54.04.045(3)(a), and row 10 sets forth the maximum permissible rate pursuant to RCW 54.04.045(3).

128 Wn.2d 26, 35 n.8, 904 P.2d 731 (1995)). This rule requires, initially, that a party must prevail in order to receive an attorney fee award. "In general, a prevailing party is one who receives an affirmative judgment in his or her favor." Riss v. Angel, 131 Wn.2d 612, 633, 934 P.2d 669 (1997). "Contractual provisions awarding attorney fees to the prevailing party also support an award of appellate attorney fees." City of Puyallup v. Hogan, 168 Wn. App. 406, 430, 277 P.3d 49 (2012). In PUD I, we concluded that "in the event that the District prevails on remand, the award of expenses [from the first trial] should not be disturbed." 184 Wn. App. at 86.

The District is the prevailing party on appeal and, as we explained in PUD I, the District's contracts with the Companies, on which it brought this lawsuit, provide for the recovery of attorney fees. See 184 Wn. App. at 82-87. Accordingly, the District is entitled to its award of fees from the first trial, its awards of fees and costs subsequent to the first trial, as reflected in the amended and restated judgment, and an award of fees and costs for this appeal.

In summary, we (1) affirm the trial court's ruling that the District did not abuse its discretion while selecting the data and inputs to utilize when calculating the maximum permissible pole attachment rate pursuant to RCW 54.04.045(3), (2) reverse the trial court's ruling incorrectly interpreting RCW 54.04.045(3)(a), and (3) affirm the judgment and award the District its fees and costs on appeal. Upon the District's compliance with RAP 18.1, a commissioner of our court will enter an appropriate order awarding fees and costs.

The judgment is affirmed.

_____
Dwyer, J.

We concur:

_____
J.

_____
Leach, J.


## RATE CALCULATION - 2007 thru 2015 - Gross

<u>Exhibit 1</u>

**APPENDIX A**

| POLE & ATTACHMENT DATA | | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) Number of Poles | | 9,460 | 9,549 | 9,586 | 9,636 | 9,667 | 9,704 | 9,662 | 9,684 | 9,784 |
| (2) Average Number of Attachments (Contacts/Pole)[1] | | 2.61 | 2.61 | 2.61 | 2.61 | 2.61 | 2.61 | 2.61 | 2.61 | 2.61 |
| (3) Space Occupied by One Attachment | | 1.00 ft | 1.00 ft | 1.00 ft | 1.00 ft | 1.00 ft | 1.00 ft | 1.00 ft | 1.00 ft | 1.00 ft |
| (4) Average Cost of Bare Pole[2] | $ | 795.63 $ | 764.79 $ | 746.26 $ | 736.42 $ | 726.88 $ | 717.11 $ | 690.16 $ | 678.54 $ | 655.00 |
| (5) Carrying Charge[3] | | 17.53% | 18.08% | 17.76% | 17.24% | 16.79% | 18.65% | 17.79% | 17.41% | 16.74% |
| **ASSIGNABLE & COMMON SPACE PER POLE** | | | | | | | | | | |
| (6) Average Pole Height | | 42.2 ft | 42.1 ft | 42.1 ft | 42.0 ft | 42.0 ft | 42.0 ft | 41.8 ft | 41.8 ft | 41.7 ft |
| Underground Pole (10% + 2') | | 6.2 ft | 6.2 ft | 6.2 ft | 6.2 ft | 6.2 ft | 6.2 ft | 6.2 ft | 6.2 ft | 6.2 ft |
| Ground Clearance (per NESC) | | 18.0 ft | 18.0 ft | 18.0 ft | 18.0 ft | 18.0 ft | 18.0 ft | 18.0 ft | 18.0 ft | 18.0 ft |
| Safety Space (per NESC) | | 3.3 ft | 3.3 ft | 3.3 ft | 3.3 ft | 3.3 ft | 3.3 ft | 3.3 ft | 3.3 ft | 3.3 ft |
| (7) Total Support & Clearance Space | | 27.5 ft | 27.5 ft | 27.5 ft | 27.5 ft | 27.5 ft | 27.5 ft | 27.5 ft | 27.5 ft | 27.5 ft |
| (8) Total Usable Space | | 14.7 ft | 14.6 ft | 14.6 ft | 14.5 ft | 14.5 ft | 14.5 ft | 14.3 ft | 14.3 ft | 14.2 ft |
| **POLE ATTACHMENT RATE** | | | | | | | | | | |
| (9) Space Factor (RCW 54.04.045 3A)[4] | | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.12 | 0.12 | 0.12 |
| (10) Space Factor (RCW 54.04.045 3B)[5] | | 0.27 | 0.27 | 0.27 | 0.27 | 0.27 | 0.27 | 0.28 | 0.28 | 0.28 |
| Maximum Attachment Rate per 3A[6] | $ | 15.34 $ | 15.21 $ | 14.58 $ | 13.97 $ | 13.42 $ | 14.71 $ | 14.73 $ | 14.18 $ | 13.16 |
| Maximum Attachment Rate per 3B[7] | $ | 37.66 $ | 37.33 $ | 35.78 $ | 34.28 $ | 32.95 $ | 36.11 $ | 34.38 $ | 33.08 $ | 30.70 |
| **Rate per RCW (1/2 of 3A + 1/2 of 3B)** | $ | 26.50 $ | 26.27 $ | 25.18 $ | 24.13 $ | 23.19 $ | 25.41 $ | 24.56 $ | 23.63 $ | 21.93 |

1. Based on sample from pole inventory
2. (Investment in Poles) / (Total No. of Poles), see Exhibit 3
3. See Exhibit 2
4. $[(3) + (8)] + \{[(3) + (8)] \times (7) + (6)\}$
5. $\{(3) + [(7) + (2)]\} + (6)$
6. $(9) \times (4) \times (5)$
7. $(10) \times (4) \times (5)$

| | | |
|---|---|---|
| Hi | $ | 26.27 |
| Lo | $ | 21.93 |
| Avg | $ | 24.29 |

**PLAINTIFF'S EXHIBITS**

**1033**